## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

---

BoDeans Cone Company, L.L.C.;
BoDeans Wafer Company, L.L.C.;
BoDeans Baking Holding Company,
L.L.C.,

                Plaintiffs,

vs.

Norse Dairy Systems; Interbake Foods
L.L.C.,

                Defendants.

**Civil No. 5:09-cv-4014**


**COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

---

For their Complaint against Defendants Norse Dairy Systems and Interbake Foods L.L.C. (collectively "NDS"), Plaintiffs BoDeans Cone Company, L.L.C.; BoDeans Wafer Company, L.L.C.; and BoDeans Baking Holding Company, L.L.C. (collectively "BoDeans") state and allege as follows:

### <u>INTRODUCTION</u>

1.    Through acquisition and anticompetitive practices, NDS has acquired and maintained monopoly control over two distinct markets: the market for cones and the market for wafers used in the production of novelty ice cream products. Indeed, until BoDeans entered each respective market, NDS dominated these industries with nearly 100% market shares.

2.     With the support of a manufacturer of novelty ice cream products dissatisfied with NDS's dominance of the market, BoDeans began manufacturing ice cream cones in 2000. By investing in state-of-the-art manufacturing facilities in Le Mars, Iowa, BoDeans began producing high quality novelty cones as efficiently, and on information and belief more efficiently, than NDS. Customers quickly responded to the arrival of competition and BoDeans' lower prices, and BoDeans earned approximately a 35% share of the market with its high-quality, low-cost cones.

3.     BoDeans sought to duplicate this success by building a state-of-the-art plant for production of wafers in 2006. NDS responded by abusing its monopoly power to avoid competition with BoDeans on the merits. In particular, NDS implemented multiple anticompetitive contractual arrangements with cone and wafer purchasers including:

- multi-year exclusive contracts requiring customers to purchase 100% of cones and/or wafers from NDS;

- bundled pricing packages with products that BoDeans does not offer, rendering BoDeans unable to compete on the prices of cones and wafers independently, even though it is as efficient a producer; and

- inclusion of exclusionary provisions in mandatory contracts leasing the machines used to fill NDS cones and wafers.

4.     NDS's anticompetitive contracts have had their intended effect: both existing and potential customers of BoDeans have declined to purchase cones and wafers from BoDeans as a result. NDS has maintained its share of the wafer market at more

than 85%, and it has reasserted monopoly control – or has a dangerous probability of doing so – over the novelty cone market with greater than 60% market share.

5.      NDS's abuse of monopoly power has inflicted profound harm on BoDeans and competition in the making of novelty cones and wafers.  With lost customers, BoDeans faces the imminent prospect of contracting its business.  Customers have lost the benefit of competition in the cone and wafer markets, a reality that will likely become permanent without the Court's intervention.

## PARTIES

6.      BoDeans Baking Holding Company, L.L.C. is an Iowa corporation with its principal place of business located in Le Mars, Iowa.  BoDeans Wafer Company, L.L.C. and BoDeans Cone Company, L.L.C. are both Iowa corporations with their principal places of business located in Le Mars, Iowa.  Both entities are wholly owned subsidiaries of BoDeans Baking Holding Company, L.L.C.

7.      Norse Dairy Systems is a subsidiary of Interbake Foods L.L.C.  Its principal place of business is located in Columbus, Ohio.

8.      Interbake Foods L.L.C. is a Delaware corporation with its principal place of business located in Front Royal, Virginia.  It is a wholly owned subsidiary of George Weston Ltd., a large Canadian conglomerate.  Interbake Foods L.L.C. has facilities throughout the Midwest and is registered to do business in Iowa.

## JURISDICTION AND VENUE

9.      Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1331 and 1337, this Court has subject matter jurisdiction as this action arises under

Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. §§ 14 and 18. The Court may grant declaratory relief pursuant to 28 U.S.C. § 2201.

10.     The Court has jurisdiction to grant preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 26 and Fed. R. Civ. P. 65.

11.     The Court has supplemental jurisdiction over BoDeans' claim under Iowa law pursuant to 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over NDS, which regularly transacts and solicits business in Iowa, including the Northern District of Iowa.

13.     Pursuant to 28 U.S.C. § 1391(b)-(c), venue is proper in this district because NDS is a corporate defendant subject to personal jurisdiction in this district and NDS has orchestrated its illegal and anticompetitive conduct with the intent to harm BoDeans, a resident of this district.

## RELEVANT MARKETS

14.     Ice cream cones are produced and sold through three distinct channels of distribution for different end uses: retail/grocery, food service, and novelty. Novelty cones are used as ingredients by dairies or other food manufacturers to make novelty ice cream products, such as sundae cones. Cones sold through grocery stores are ultimately purchased and filled by consumers, and cones sold to restaurants or food service customers are generally filled by hand at the point of sale to consumers.

15.     Novelty cones constitute a distinct product market under the antitrust laws. Novelty cones are generally filled by machine rather than by hand, must be suitable for

specialized sleeves and filling, and are subject to particular quality standards. Novelty cones are sold to distinct customers and through distinct channels of distribution. Novelty cones must be compatible with filling machines used by dairies to produce finished and filled novelty ice cream products. Dairies require more stringent adherence to food safety standards and requirements than purchasers of retail or food service cones.

16.     As a result, purchasers of novelty cones will not substitute retail or food service cones in response to a small but significant non-transitory price increase for novelty cones. Nor are manufacturers of retail or food-service cones likely to enter the novelty cone market in response to such an increase given its unique requirements, equipment, distribution, and customers. Because novelty cones are ingredients of filled ice cream products, demand for such cones is relatively inelastic and price insensitive.

17.     The novelty cone market is characterized by barriers to entry including sufficient scale of operation to compete efficiently, capital investment, food safety requirements, quality standards established by both government agencies and dairies, process technology, and compatibility with filling machines.

18.     Wafers are also used by dairies and food manufacturers to produce novelty ice cream products, such as ice cream sandwiches. Unlike novelty cones, wafers are uniquely made for this purpose, and there is no separate channel of distribution for retail or food-service wafers. Production of wafers requires unique and distinct machine processes.

19.     Ice cream wafers constitute a distinct product market under the antitrust laws. Dairies have no alternative products that can be substituted in response to a small

but significant non-transitory price increase for wafers. Like novelty cones, demand for wafers is relatively inelastic and price insensitive because wafers are an ingredient or component product.

20.    The wafer market is characterized by the same barriers to entry that confront would-be entrants to the novelty cone market. Producing a consistently high quality product is even more difficult and poses an even higher obstacle to market entry. Like novelty cones, wafers must be compatible with filling machines used to make finished ice cream products.

21.    Machines used to fill novelty ice cream products constitute a distinct product market under the antitrust laws. These machines are designed solely for this purpose, and product substitutes do not exist. Demand for filling machines is determined by the production needs for filled ice cream products, and is therefore relatively inelastic and price insensitive.

22.    The market for filling machines is characterized by high barriers to entry. Production of filling machines requires significant capital investment, engineering, and product development and servicing.

23.    The relevant geographic market is North America, specifically the United States and Canada. Producers of novelty cones and wafers located outside of North America face significant additional barriers to competing in these markets that effectively preclude such producers as viable potential competitors. Barriers include logistics associated with economically shipping low weight products overseas, timely supply required in the food industry, foreign conversion rates, maintaining quality through

overseas shipping, and compliance with government safety requirements across jurisdictions.

## FACTS

### NDS's Dominance Of The Novelty Cone, Wafer, And Associated Equipment Markets

24.     NDS achieved monopoly control over the novelty cone and wafer markets by acquiring all competitors in a series of acquisitions.  By 2000, NDS possessed a 100% share of the novelty cone market and a 97% share of the wafer market.  Customers for novelty cones and wafers had no viable alternatives to NDS.

25.     In addition to acquiring monopolies in the novelty cone and wafer markets, NDS also achieved a dominant position in the market for packaging used to make novelty ice cream products.  Ice cream products that do not use cones or wafers require tubes or cups to produce push-up tube treats or novelty cups.  Cone and wafer products require sleeves or wrappers.  Packaging is a necessary component of novelty ice cream products that must be purchased by producers of these products.  NDS is the dominant supplier of this packaging.

26.     Additionally, NDS possesses monopoly power in the market for filling machines used to produce novelty ice cream products.  Specific machines are used to produce novelty cone, sandwich or wafer, cup, and tube products.  NDS is the dominant supplier of each type of machine.  For machines used to fill novelty cone products, NDS possesses approximately 60% of the market.  For machines used to fill wafer products, NDS possesses 90% of the market.

27.     To maximize its control of the various markets in which it sells products and to leverage its monopoly power, NDS does not sell filling machines. Instead, NDS provides them to dairies only through lease. The leases contain exclusionary provisions. For example, NDS's machine leases state that dairies can only use NDS cones, wafers, or packaging on the NDS machines. This provision excludes alternative suppliers of cones and wafers from the vast majority of the market for these products. This provision also coerces lessees of NDS filling machines to purchase cones and wafers from NDS.

28.     There is no legitimate business justification for NDS's refusal to sell its filling machines or for its mandated exclusion of alternative cone and wafer products from its machines. Rival cones and wafers can be designed to be compatible with NDS machines. NDS uses its leases to exercise continuing control over dairies and, in particular, to preclude them from purchasing cones or wafers from an alternative supplier.

29.     In addition to machines, cones, wafers, and packaging products, NDS offers support services to dairies, including product development and marketing support. NDS functionally bundles these services with its products in order to render dairies dependent on NDS. As a result, it is impossible for many dairies to pull all, or even a significant portion, of their business from NDS in favor of an alternative supplier.

30.     With interlocking monopolies in the cone, wafer, packaging, and machine markets, NDS has charged customers supra-competitive prices.

**BoDeans' Entry Into The Novelty Cone Market**

31.     BoDeans entered the novelty cone market in 2000 at the urging of Wells Dairy, an Iowa-based producer of novelty ice cream products frustrated by the lack of

competition in the market for novelty cones. BoDeans established itself as the only competitor to NDS in the novelty cone market, and it remains so.

32.     BoDeans entered the market with the scale and technology to produce novelty cones more efficiently than NDS. Through various expansions, BoDeans constructed and operates out of a 75,000 square-foot facility in Le Mars, Iowa with state-of-the-art machines. The facility enables BoDeans to compete head-to-head with NDS in terms of capacity, quality, and price. BoDeans is capable of supplying dairies of every size and need.

33.     In 2000, BoDeans began selling novelty cones of comparable quality to NDS cones, often at lower prices. Producers of novelty cone products welcomed the competition and BoDeans quickly gained customers, including Wells Dairy and other producers.

34.     In 2001, NDS responded to BoDeans' market success by adopting exclusive dealing contracts and a bundled pricing program. For example, NDS offered significant yearly rebates to customers that agreed to purchase 100% of their cones *and* wafers from NDS. At the time, BoDeans did not sell wafers and could not compete unless it discounted its cone products to the full extent of the bundled discount offered by NDS.

35.     BoDeans raised the anticompetitive nature of these contracting practices with NDS, and NDS substantially modified the program as a result. In particular, NDS reduced the required purchase commitment for rebates to 50% of each product category.

Able to compete on a more level playing field, BoDeans captured approximately 35% of the novelty cone market in subsequent years.

36.     With its success in the novelty cone market, BoDeans entered the wafer market in 2006, again at the request of Wells Dairy.  BoDeans entered the market aggressively by building a state-of-the-art, 92,000 square-foot manufacturing facility in Le Mars, Iowa.  With new technology and a large scale, BoDeans is able to match or exceed the quality of NDS's wafers, while producing the wafers at least as efficiently.

**NDS Adopts Anticompetitive Measures To Restrict BoDeans' Expansion**

37.     Faced with BoDeans' market success in novelty cones and the presence of competition for the first time in wafers, NDS exploited its monopoly power.  NDS once again implemented exclusive dealing contracts and bundled pricing with the intent to exclude BoDeans from the wafer market and to reverse BoDeans' gains in the novelty cone market.  NDS also used its leases for filling machines, and control of the filling machine market, to preclude customers from purchasing cones or wafers from BoDeans.

38.     Since BoDeans now offers wafers and cones, NDS added packaging products to its bundled discounting program.  NDS offers steep discounts to customers that agree to purchase 100% of their cones, wafers, and packaging from NDS.  The contracts containing the 100% exclusivity provision and bundled discounts generally have terms spanning multiple years.

39.     The 100% exclusivity requirement imposed by NDS makes it impossible for a substantial share of cone and wafer customers to purchase from BoDeans (or any other potential competitor).  NDS has placed customers in the position of buying all or

none of their cone and wafer needs from NDS to obtain discounts, but very few customers have the option of completely declining to do business with NDS. Barriers to switching all business to BoDeans or a new entrant include: potential loss of NDS filling machines and the cost of acquiring new machines; the need to purchase packaging from NDS; costs of switching and retraining; and the need to gradually introduce new products to ensure compliance with quality and safety standards.

40.     NDS has manipulated its bundled pricing program so that BoDeans cannot profitably compete on price. NDS significantly increased the size of the discounts so as to preclude BoDeans from being able to match the discount on any one product, despite producing cones and wafers at least as efficiently as NDS. On information and belief, NDS's discounts, when totaled and applied to any one product, result in NDS selling cones or wafer products below cost.

41.     The effect of NDS's 100% exclusivity requirement is to preclude any NDS customer from buying any novelty cones or wafer from BoDeans. Given NDS's complete control over the wafer market, this reality has foreclosed BoDeans from a substantial portion of the market. In particular, BoDeans is effectively foreclosed from selling to any customer that purchases multiple products from NDS and/or uses NDS filling equipment. As a result, BoDeans faces exclusion from any customer that purchases from NDS. This includes many of BoDeans' existing customers.

42.     The timing, structure, and effect of NDS's exclusive contracts and bundled discount scheme demonstrate its intent to maintain or reassert its monopoly of

the novelty cone and wafer markets by excluding BoDeans, and all potential competitors, from the market.

43.    Moreover, NDS's exclusionary leasing provisions for its filling machines foreclose a substantial share of the market.  The 90% of wafer-consuming companies that use NDS machines cannot purchase wafers from BoDeans without adding a second machine, which creates artificial, steep barriers to competing.  Additionally, BoDeans cannot introduce, or qualify, its wafers to dairies unless the dairy first obtains a non-NDS machine.

44.    The exclusive leasing provision, which prevents dairies from using non-NDS cones or wafers on NDS machines, is coercive.  Companies have few choices in machine suppliers, and switching machines entails capital and retraining costs.  As a result, many dairies are effectively compelled to purchase NDS cones and wafers to obtain or retain NDS filling machines.

**NDS's Misconduct Has Caused Anticompetitive Impacts**

45.    BoDeans has suffered tangible and intangible harm as a result of NDS's anticompetitive conduct.  BoDeans invested heavily to enter the cone and wafer markets with a quality product and sufficient capacity to win customers and market share.  NDS's exclusive contracts, bundled pricing, and tying arrangements have cost BoDeans business and limited competitive options to NDS.

46.    In its wafer business, NDS has preserved its monopoly control over the wafer business by preventing BoDeans from entering the market as a viable competitor.

BoDeans has been unable to win any significant market share, despite offering a product of comparable quality generally at prices below NDS's.

47.     In the novelty cone business, BoDeans has lost customers and market share as a result of NDS's anticompetitive conduct.  For example, Ice Cream Specialties, an Indiana-based dairy and former BoDeans' customer, entered a 3-year exclusive deal with NDS for cones and wafers in 2008.  While BoDeans' products had been qualified for purchase by Ice Cream Specialties, BoDeans will likely be unable to make any sales to this account.

48.     In late 2008, former BoDeans' customer Dean Foods (Mayfield Dairy, located in Athens, Tennessee) entered a multi-year exclusive contract with NDS containing bundled discounts.  BoDeans lost $800,000 in sales on cone and wafer products as a result.

49.     Fieldbrook Farms, a BoDeans' customer in New York, recently notified BoDeans that it will likely terminate its contract with BoDeans in May 2009, having entertained an exclusive multi-year contract with NDS containing bundled discounts.  BoDeans faces the imminent loss of $1,600,000 in sales of existing cone business and the lost opportunity to sell wafer products.  Loss of the Fieldbrook Farms account would likely force BoDeans to slow production and lay off workers.

50.     NDS's anticompetitive practices have cost BoDeans millions of dollars in lost sales.  Due to NDS's misconduct, BoDeans may need to lay off workers and take other measures to contract its business.  Beyond the economic damages, BoDeans has suffered intangible harms, such as lost good will among its customers and lost business

relationships. Lost sales also undermine BoDeans' ability to invest in new efficiencies and product innovations, harming its ability to compete against NDS.

51.     NDS's anticompetitive conduct has directly undermined overall competition in the novelty cone and wafer markets. BoDeans has been the only competitive option to NDS in these markets, and NDS's conduct threatens BoDeans' viability as a competitive option and hence competition overall.

52.     If NDS succeeds with its scheme to undermine the competition posed by BoDeans, customers face the likelihood that NDS will have the power to recoup any current price discounts in the future. BoDeans represents the only competitive restraint on NDS's prices, and there are no other likely new entrants to the markets. If NDS harms BoDeans' ability to compete, NDS will be free to raise prices and recoup past discounts.

## COUNT ONE:  MONOPOLIZATION

## VIOLATION OF SHERMAN ACT § 2

53.     BoDeans realleges and incorporates by reference the allegations set forth in paragraphs 1 through 52, above.

54.     NDS possesses monopoly power in the novelty cone and wafer markets.

55.     NDS has unlawfully maintained its monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  NDS has demonstrated an ability to exclude competitors and control prices in these markets.

56.     In furtherance of its unlawful maintenance of monopoly power, NDS has undertaken anticompetitive and exclusionary conduct intended to preclude BoDeans from competing successfully in the relevant markets.  NDS's anticompetitive and exclusionary

Case 5:09-cv-04014-MWB   Document 2   Filed 02/17/09   Page 14 of 22

conduct includes:  a) entering into exclusive dealing agreements with dairies and other direct customers of novelty cones; b) bundling discounts on wafers, cones, and packaging; and c) tying filling machine leases to exclusive purchasing requirements for cones and wafers.

57.     There is no business justification or pro-competitive rationale for NDS's exclusionary contracts, bundled discounts, or exclusionary machine leases.

58.     BoDeans has suffered and will suffer antitrust injury.  NDS's conduct has caused BoDeans to lose customers that it had or would have had absent NDS's anticompetitive conduct.  NDS's conduct has caused BoDeans to lose customer good will undermined its ability to expand in the relevant markets, and has caused, and threatens to continue to cause, BoDeans to lose business and suffer damages.

59.     NDS's actions have reduced and are likely to reduce competition for customers of novelty cones and wafers.   Ultimately, NDS's actions have caused, or are likely to cause, dairy customers to pay more for cones and wafers and consumers to pay more for novelty ice cream products.

## COUNT TWO:  ATTEMPTED MONOPOLIZATION

## VIOLATION OF SHERMAN ACT § 2

60.     BoDeans realleges and incorporates by reference the allegations set forth in paragraphs 1 through 59, above.

61.     If NDS has not already achieved and maintained monopoly power, there is a dangerous probability that NDS will acquire monopoly power in the novelty cone and wafer markets.

62.     NDS has engaged in anticompetitive conduct designed to gain and/or maintain monopoly control of the novelty cone and wafer markets.  NDS's anticompetitive and exclusionary conduct includes:  a) entering into exclusionary agreements with dairies and other direct customers of novelty cones; b) bundling discounts on wafers, cones, packaging, and/or related services; and c) tying filling machines leases to exclusive purchasing requirements for cones and wafers.

63.     NDS has undertaken this anticompetitive conduct with the intent to exclude BoDeans from the novelty cone and wafer markets and to acquire monopoly power in these markets.

## COUNT THREE:  RESTRAINT OF TRADE

## VIOLATION OF SHERMAN ACT § 1

64.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 63.

65.     NDS has entered into exclusive dealing agreements with dairies that unreasonably restrain trade.  Specifically, NDS's machine filling leases and its pricing programs require customers to purchase 100% of their novelty cones and wafers from NDS.

66.     NDS has entered into exclusionary bundled rebate agreements with dairies that unreasonably restrain trade.  Specifically, NDS offers discounts to customers only if they purchase 100% of novelty cones and wafers from NDS.

67.     These agreements have no business justification or pro-competitive rationale.

-16-

68.     NDS's agreements alleged above are an unreasonable restraint of trade and violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

69.     BoDeans has suffered and will suffer antitrust injury. NDS's conduct has hindered and delayed BoDeans' ability to enter into and expand in the novelty cone and wafer markets, and has caused, and threatens to continue to cause, it to lose business and suffer damages.

70.     NDS's actions have excluded competition from the markets for novelty cones and wafers. Ultimately, NDS's actions will cause dairy customers to pay higher prices for cones and wafers and consumers to pay a higher price for novelty ice cream products than would be the case in a competitive market.

## COUNT FOUR: TYING

## VIOLATION OF SHERMAN ACT § 1

71.     BoDeans realleges and incorporates by reference the allegations set forth in paragraphs 1 through 70.

72.     Novelty cones, wafers, packaging, and filling machines are distinct and separate products.

73.     NDS has conditioned the placement of filling machines on the purchase of wafers, cones, and packaging from NDS by requiring lessees of filling machines to use only NDS cones, wafers, and packaging on NDS machines.

74.     NDS possesses such power in the market for filling machines that its lease terms are coercive. Dairies have insufficient alternatives to negotiate alternative lease terms or to reject NDS's leasing program altogether.

75.     There is substantial interstate commerce involved in the novelty cone, wafer, and packaging markets.

76.     NDS's leasing requirements constitute tying arrangements that are *per se* illegal.

77.     BoDeans has suffered and will suffer antitrust injury. NDS's conduct has hindered and delayed BoDeans' ability to enter into and expand in the novelty cone and wafer markets, and has caused, and threatens to continue to cause, it to lose business and suffer damages.

## COUNT FIVE:  EXCLUSIVE DEALING

## VIOLATION OF CLAYTON ACT § 3

78.     BoDeans realleges and incorporates by reference the allegations set forth in paragraphs 1 through 77.

79.     NDS has entered into exclusive and *de facto* exclusive dealing agreements with dairies and customers that may tend to substantially lessen competition in, or tend to create a monopoly in, one or more lines of commerce, namely the sale of novelty cones and wafers. These exclusive and *de facto* exclusive dealing agreements, including NDS's exclusionary bundled pricing program and its exclusionary machine leasing provisions, preclude competition from BoDeans and all other potential competitors in the market for novelty cones and wafers, with no business justification or pro-competitive rationale.

80.     NDS's exclusive and *de facto* exclusive agreements violate Section 3 of the Clayton Act, 15 U.S.C. § 14.

81.    BoDeans has suffered and will suffer antitrust injury.  NDS's conduct has hindered and delayed BoDeans' ability to enter into and expand in the relevant markets, and has caused, and threatens to continue to cause, BoDeans to lose business and suffer damages.

82.    NDS's actions have excluded competition from the markets for novelty cones and wafers.  Ultimately, NDS's actions will cause dairy customers to pay higher prices for cones and wafers and consumers to pay a higher price for novelty ice cream products than would be the case in a competitive market.

## COUNT SIX:  VIOLATION OF IOWA COMPETITION LAW

## IOWA CODE § 553.5

83.    BoDeans realleges and incorporates by reference the allegations set forth in paragraphs 1 through 82.

84.    NDS possesses monopoly power, or is attempting to establish monopoly power, in the markets for novelty cones and wafers.

85.    NDS is using its monopoly power to exclude BoDeans and other potential competitors from the relevant markets.  In particular, NDS is using a bundled pricing scheme, exclusive dealing contracts, and tying arrangements to exclude BoDeans from the market and to foreclose competition.

86.    BoDeans has suffered and will suffer antitrust injury.  NDS's conduct has hindered and delayed BoDeans' ability to enter into and expand in the relevant markets, and has caused, and threatens to continue to cause, BoDeans to lose business and suffer damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for the following relief from the Court:

A.      A declaration that NDS has unlawfully monopolized, and/or attempted to monopolize, the novelty cone and wafer markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

B.      A declaration that NDS unreasonably restrained trade in the novelty cone and wafer markets, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.      A declaration that NDS has engaged in illegal tying arrangements in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

D.      A declaration that NDS has unlawfully engaged in exclusive dealing that may substantially reduce competition or may tend to create a monopoly in the novelty cone and wafer markets, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

E.      A declaration that NDS has unlawfully used monopoly power to exclude competition, in violation of the Iowa Competition Law, Iowa Code § 553.5.

F.      An award of treble damages in an amount to be proven at trial, and attorneys' fees and costs of suit, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

G.      An award of double damages in an amount to be proven at trial, and attorneys' fees and costs of suit, pursuant to Iowa Code § 553.12.

H.      Preliminary and permanent injunctive relief prohibiting NDS from entering or enforcing exclusionary contracts and further requiring NDS to take affirmative steps to ensure that purchasers of novelty cone and wafers know they are not contractually precluded from purchasing BoDeans' (or any new entrant's) cones and wafers.

I.	Preliminary and permanent injunctive relief prohibiting NDS from using bundled pricing.

J.	Preliminary and permanent injunctive relief prohibiting NDS from entering or enforcing exclusionary provisions in its machine leases.

K.	Preliminary and permanent injunctive relief prohibiting NDS from continuing violations of Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act.

L.	Such other and further relief as the Court deems just and necessary.

## JURY TRIAL DEMAND

BoDeans demands trial by jury.

Dated:  February 17, 2009

**FAEGRE & BENSON LLP**

s/ Kimberly J. Walker
Kimberly J. Walker (Iowa AT0008218)
801 Grand Ave., Suite 3100
Des Moines, Iowa  50309
Telephone: (515) 248-9000
Facsimile: (515) 248-9010
E-Mail: *kwalker@faegre.com*

and

Richard A. Duncan (MN # 192983) (*pro
hac vice* motion pending)
E-Mail: *rduncan@faegre.com*
Craig S. Coleman (MN # 325491) (*pro hac
vice* motion pending)
E-Mail: *ccoleman@faegre.com*
Melina Williams (MN # 0387635) (*pro hac
vice* motion pending)
E-Mail: *mwilliams2@faegre.com*
Faegre & Benson LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
Telephone: (612) 766-7000

**Attorneys for Plaintiffs**

fb.us.3623445.01