**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

BODEANS CONE COMPANY, L.L.C.,
BODEANS WAFER COMPANY,
L.L.C., and BODEANS BAKING
HOLDING COMPANY, L.L.C.,

      Plaintiffs,

vs.

NORSE DAIRY SYSTEMS, L.L.C.,
and INTERBAKE FOODS, L.L.C.,

      Defendants.

No. C 09-4014-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING THE
PARTIES' MOTIONS IN LIMINE**

FILED UNDER SEAL UNTIL TEN
DAYS AFTER COMPLETION OF
TRIAL

_____

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   *A. BoDeans's Motion In Limine* . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      *1. Purportedly privileged documents* . . . . . . . . . . . . . . . . . . . . . 5
         *a. E-mail about the DOJ's comments on the Norse Dairy
            acquisition* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            *i. Arguments of the parties* . . . . . . . . . . . . . . . . . 6
            *ii. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
         *b. Evidence of Norse Dairy's purported cost-benefit
            analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            *i. Arguments of the parties* . . . . . . . . . . . . . . . . . 9
            *ii. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      *2. Evidence of future market shares* . . . . . . . . . . . . . . . . . . . . 12
         *a. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . 12

|  |  | *b.* | *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 |
|  | *3.* |  | *The list of manufacturers of novelty ice cream products* . . . . | 17 |
|  | *4.* |  | *Evidence relating to the Iowa Attorney General* . . . . . . . . | 18 |
|  |  | *a.* | *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . | 18 |
|  |  | *b.* | *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 |
|  | *5.* |  | *Evidence about Dean Jacobson's vacation home* . . . . . . . . | 21 |
|  |  | *a.* | *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . | 21 |
|  |  | *b.* | *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
| *B.* | *Norse Dairy's Motion In Limine* . . . . . . . . . . . . . . . . . . . . . . | 22 |
|  | *1.* | *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . | 23 |
|  | *2.* | *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
|  |  | *a.* | *Admissibility of surveys in general* . . . . . . . . . . . . . . | 27 |
|  |  | *b.* | *Admissibility under Rule 803(3) as state of mind evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 |
|  |  | *c.* | *Admissibility under the "residual" exception in Rule 807* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 |
|  |  |  | *i. Trustworthiness* . . . . . . . . . . . . . . . . . . . . . | 30 |
|  |  |  | *ii. Other requirements* . . . . . . . . . . . . . . . . . . . | 32 |
|  |  | *d.* | *Admissibility as Rule 801(d)(2) adoptive admissions* . . | 33 |
|  |  | *e.* | *Admissibility as business records pursuant to Rule 803(6)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35 |
|  |  | *f.* | *Admissibility over "double hearsay" objections* . . . . . | 36 |
|  |  | *g.* | *Admissibility over Rule 403 objections* . . . . . . . . . . | 37 |

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# I. INTRODUCTION

This is a lawsuit involving "antitrust" claims by plaintiffs BoDeans Cone Company, L.L.C., BoDeans Wafer Company, L.L.C., and BoDeans Baking Holding Company, L.L.C. (collectively "BoDeans") against defendants Norse Dairy Systems, L.L.C., and Interbake Foods, L.L.C. (collectively "Norse Dairy"). Both BoDeans and Norse Dairy

make and sell cones and wafers to manufacturers of novelty ice cream cones and novelty ice cream sandwiches. Norse Dairy also makes filling machines for novelty cones and novelty ice cream sandwiches and leases those machines to manufacturers of novelty ice cream products.

BoDeans's first two "antitrust" claims against Norse Dairy are "monopolization" claims: BoDeans alleges that Norse Dairy has "monopolized" and "attempted to monopolize" the relevant markets for novelty cones or wafers in the United States and Canada by engaging in anticompetitive conduct, consisting of "exclusive dealing arrangements" and "tying arrangements." BoDeans's third and fourth claims are "anticompetitive conduct" claims: BoDeans alleges that Norse Dairy has engaged in "unlawful exclusive dealing arrangements" that obligated its customers to purchase all or substantially all of their novelty cones and/or wafers from Norse Dairy, which unreasonably restrained trade by substantially harming competition in a substantial share of the relevant market, and that Norse Dairy has engaged in "unlawful tying arrangements" pursuant to which Norse Dairy provided filling machines for novelty cones or wafers to customers only on the condition that the customers purchase the novelty cones or wafers run on those machines from Norse Dairy, thus "tying" the availability of the filling machines to the purchase of the cones or wafers from Norse Dairy, and thereby harming competition. BoDeans seeks "lost profits" damages for Norse Dairy's alleged violations of the antitrust laws and injunctive relief from unlawful conduct. A jury trial on BoDeans's damages claims, consolidated with proceedings on BoDeans's March 11, 2009, Motion For Preliminary Injunction (docket no. 23), is currently set to begin on November 9, 2009.

The motions now pending before the court are the following: (1) the portions of BoDeans's September 15, 2009, Motion In Limine (docket no. 52) not resolved by the

court's September 16, 2009, Order (docket no. 56),[1] and (2) Norse Dairy's September 15, 2009, Motion In Limine To Exclude Testimony And Evidence Relating To Surveys Conducted By Walker Information, Inc. (docket no. 55). BoDeans filed an Opposition (docket no. 67) to Norse Dairy's motion on September 24, 2009, and Norse Dairy filed a Memorandum Of Law In Opposition To Motion In Limine (docket no. 69) also on September 24, 2009. Norse Dairy then filed a Reply Memorandum (docket no. 72) in further support of its Motion In Limine on September 29, 2009, and BoDeans filed a Reply Memorandum (docket no. 75) in further support of its Motion In Limine on October 1, 2009. The court finds it unnecessary to hold oral arguments on these motions; therefore, they are deemed fully submitted on the parties' written submissions.

The court will consider these evidentiary motions in turn.

## II. LEGAL ANALYSIS

### A. BoDeans's Motion In Limine

In the as yet unresolved portions of its Motion In Limine, BoDeans seeks a determination that certain exhibits are admissible over Norse Dairy's assertions of work-product and attorney-client privilege and a ruling excluding various items or categories of evidence as irrelevant and/or unduly prejudicial. With one exception, Norse Dairy opposes the requested rulings.

---

[1] In its September 16, 2009, Order, the court denied without prejudice to challenges at trial that part of BoDeans's September 15, 2009, Motion In Limine seeking to preclude Norse Dairy from presenting testimony or other evidence from Norse Dairy's expert, Dr. Carlton, related to BoDeans's tying claim.

## 1. *Purportedly privileged documents*

BoDeans asserts, first, that Norse Dairy is improperly claiming attorney-client and work-product privileges as to certain documents and that these documents should be admissible at trial. BoDeans identifies the evidence in question in this part of its motion as (1) an e-mail from one Interbake executive to other Interbake executives related to antitrust concerns raised by the U.S. Department of Justice (DOJ) in response to the acquisition of Norse Dairy Systems by Interbake Foods, L.L.C., in 2000, and (2) a document, created in response to BoDeans's demand letter giving rise to this litigation, entitled "BoDeans Decision Tree," that purportedly attempted to quantify the costs to Norse Dairy if it were to stop using the tying arrangements challenged by BoDeans.

### a. *E-mail about the DOJ's comments on the Norse Dairy acquisition*

On May 25, 2000, Ray Baxter, then-president of Interbake Foods, emailed four other Interbake executives the following message, with the subject line "NDS [Norse Dairy Systems] Acquisition":

> In getting feedback for [sic] our Washington lawyers after our release by the DOJ, there were two comments by the government for future reference.
>
> 1) We are squeaking by on this acquisition, but they will be looking very closely at any future deals done by Interbake in the Dairy supply industry that would add to our market power, particularly if we attempt to buy a new entrant who is challenging us with BOTH product and equipment.
>
> 2) Our removing our equipment from Pet Hickory to "enforce exclusivity" with a customer may have been an abuse of market power. They will pursue any complaints from customers in the future related to our using our equipment/product combination to maintain an exclusive

> relationship with a customer and to raise "unfair" entry barriers.
>
> Customers will be sensitive, particularly over the next couple of years to an [sic] perceived abuse of our market share. This just reinforces how careful we will have to be as we bring three sets of pricing, terms, and conditions together.

BoDeans's Motion In Limine (docket no. 52), Exhibit 2 (also marked BoD002249 and Baxter Deposition Exhibit 4). No attorneys were copied on the e-mail. BoDeans does not explain how it came into possession of the e-mail, or allege that Norse Dairy inadvertently produced the document, only that the e-mail was "produced by BoDeans."

*i.* ***Arguments of the parties.*** BoDeans argues that the e-mail is not work product, because it could not have been prepared in anticipation of litigation, where it was not prepared until *after* the conclusion of the DOJ investigation of Interbake's acquisition of Norse Dairy. BoDeans also argues that the document does not gain attorney-client privilege simply because it contains comments by DOJ attorneys apparently conveyed to Norse Dairy's president by Norse Dairy's "Washington lawyers." BoDeans also argues that Norse Dairy cannot claim privilege over a document produced by BoDeans.

Norse Dairy argues that the e-mail communicates outside counsel's opinion work product regarding potential future litigation by the DOJ. Norse Dairy argues that Mr. Baxter has explained, in an affidavit attached to Norse Dairy's Opposition as Exhibit E, that Interbake's outside counsel provided him with legal advice and opinions regarding pre-merger review by the DOJ, so that outside counsel did not merely pass along verbatim comments from the DOJ. Norse Dairy argues that, because the e-mail represents a summary of advice, it should be protected. Norse Dairy argues that the conclusion of the DOJ investigation did not end the work-product nature of the e-mail, because it is clear from the text that the advice it conveyed concerned business practices in anticipation of

future investigations and litigation. Norse Dairy also contends that BoDeans should be compelled to explain how this privileged document came into BoDeans's possession and why it was not immediately returned when it was discovered, but more importantly, Norse Dairy argues that BoDeans cannot assert that any privilege was waived on the present record.

  ***ii.***   ***Analysis***. Determination of whether a document was prepared in anticipation of litigation, such that it may have work-product privilege protection, is a factual determination. *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987) (seminal Eighth Circuit case on work-product privilege). The author of the e-mail in question here is Ray Baxter, an Interbake executive who was not involved in giving legal advice or in mapping litigation strategy in any individual case. *Id.* The court finds that there is no indication on the face of the e-mail that it represents a summary of the advice of counsel, rather than simply a summary of comments and concerns of the DOJ conveyed by one Interbake executive to other Interbake executives—even if there is an inference that Interbake's attorneys may have been the intermediaries between the DOJ and the author.[2] Moreover, the document does not indicate on its face that it was prepared in the course of or in anticipation of any *particular* litigation, but as a sort of *post mortem* on the DOJ's then-concluded investigation of Interbake's acquisition of Norse Dairy, with an eye toward business planning to avoid *a general possibility* of future litigation. *See Simon*, 816 F.2d

---

[2] The court notes that this inference is suspect, because the e-mail actually states, "In getting feedback *for* our Washington lawyers after our release by the DOJ . . . ," not "In getting feedback *from* our Washington lawyers after our release by the DOJ. . . ." BoDeans's Motion In Limine (docket no. 52), Exhibit 2 (also marked BoD002249 and Baxter Deposition Exhibit 4) (emphasis added). Thus, the text of the e-mail actually suggests that the comments of the DOJ were conveyed *to* Interbake's "Washington lawyers" by Interbake executives, not the other way around.

at 401-02 (focusing on preparation of a document in the course of "particular" litigation, or an "individual case," or litigation "already in prospect," or "defense of any particular lawsuit," to which work-product privilege may apply, as distinguished from a document prepared in the ordinary course of business or for purposes of business planning, including litigation generally, to which no work-product privilege would apply). "A business corporation may engage in business planning on many fronts, among them litigation," and business planning that considers the possible litigation risks involved does not cloak pertinent documents with work-product privilege. *Id.* The e-mail at issue here represents no more than business planning.

Thus, the court concludes that the e-mail in question is not protected by work-product privilege and is admissible.

### b.    *Evidence of Norse Dairy's purported cost-benefit analysis*

Norse Dairy notified BoDeans that it had inadvertently produced in this litigation certain privileged documents, including an April 21, 2008, e-mail circulated among Norse Dairy executives to which was attached a spreadsheet entitled "BoDeans Decision Tree." BoDeans's Motion In Limine (docket no. 52), Exhibits 6 & 7. The "BoDeans Decision Tree" indicated projected costs of discontinuing tying schemes for Norse Dairy's filling machines and cones and wafers.

The parties agree (or Norse Dairy does not dispute) that the "BoDeans Decision Tree" was marked by BoDeans as a deposition exhibit during the deposition of Scott Fullbright, a top Norse Dairy executive, that Mr. Fullbright testified that he directed another Norse Dairy executive, Gunter Brinkman, to undertake the analysis and to prepare the spreadsheet for the "BoDeans Decision Tree," and that Mr. Fullbright then answered questions about the spreadsheet without Mr. Fullbright or his counsel (lead counsel for Norse Dairy in this case) interposing a privilege objection. Mr. Fullbright explained, *inter*

*alia*, that the "BoDeans Decision Tree" was "an attempt to quantify a cost of doing business if we just said, 'Well, let's not resist the lawsuit [by BoDeans].'" BoDeans's Motion In Limine (docket no. 52), Exhibit 6 (deposition of Mr. Fullbright, p. 200, *ll.* 18-21). Mr. Fullbright also testified, "I'd asked Mr. Brinkman to try to prepare a risk, you know, what's the cost of doing this, you know, of just immediately changing our business model." *Id.* at Exhibit 6 (deposition of Mr. Fullbright, p. 207, *ll.* 12-16). On the other hand, Norse Dairy asserts that Mr. Brinkman later testified in deposition that he was directed to prepare the document by Norse Dairy's counsel and that a different attorney present at Mr. Brinkman's deposition asserted that the document was privileged. *See* Norse Dairy's Opposition (docket no. 69), Exhibit G (deposition of Mr. Brinkman, p. 237, *l.* 14 to p. 238, *l.* 13) (when asked if the document was prepared at the direction of counsel for purposes of this litigation, Mr. Brinkman initially said, "It was, yes, it was prepared to discuss—prepared in preparation for our response to the litigation," but a moment later, when asked again if the document was prepared at the direction of counsel or was something that he and Mr. Fullbright thought to do on their own, Mr. Brinkman answered, "This was prepared—well, we prepared it in order to quantify a discussion we had had with counsel the day before or two days before.").

*i.* ***Arguments of the parties***. BoDeans acknowledges that this document was prepared in response to BoDeans's demand letter ultimately leading to this litigation. Nevertheless, BoDeans argues that the document cannot be privileged, because Mr. Fullbright took responsibility for its creation and waived any privilege by testifying about it. BoDeans also argues that the document cannot be privileged work product, because it is a business-planning document, and no lawyer participated in its preparation. BoDeans asserts that the document was not prepared to obtain legal advice, but to consider the costs of discontinuing business as usual. Indeed, BoDeans argues that an analysis

quantifying the full financial benefit to Norse Dairy of its tying scheme has absolutely nothing to do with preparing a legal defense or any relevant legal issue.

Norse Dairy asserts that the document was plainly prepared at the request of counsel to facilitate legal advice relating to *this* litigation. Norse Dairy asserts that Mr. Fullbright (and his counsel) did not waive any privilege, because they were unaware of the origin and the purpose of the document created by Mr. Brinkman, so that any waiver was inadvertent and unintentional—indeed, Norse Dairy contends that counsel for BoDeans acknowledged that neither Mr. Fullbright nor the attorney present at his deposition would necessarily have immediately recognized the privileged nature of the spreadsheet, where there was no indication that the document was prepared for counsel. Norse Dairy argues that the protective order in this case requires the return of the inadvertently produced document.

*ii.* ***Analysis***. The court finds that the deposition testimony by Mr. Brinkman is nowhere near as conclusive as Norse Dairy suggests as to the reason that Mr. Brinkman prepared the spreadsheet. Rather, Mr. Brinkman gave somewhat inconsistent, equivocal, and possibly evasive answers to direct questions about that specific point. *See* Norse Dairy's Opposition (docket no. 69), Exhibit G, (deposition of Mr. Brinkman, p. 237, *l.* 14 to p. 238, *l.* 13 (quoted above)). Moreover, to the extent that Mr. Brinkman's deposition testimony suggests that he prepared the spreadsheet at the request of counsel, that testimony is plainly contrary to Mr. Fullbright's testimony that *he* requested that Mr. Brinkman prepare the document. BoDeans's Motion In Limine (docket no. 52), Exhibit 6, (deposition of Mr. Fullbright, p. 207, *ll.* 12-16 (also quoted above)). Nevertheless, the court will assume, without deciding, that the document was prepared at the direction of and for the purpose of a consultation with Norse Dairy's attorneys and, therefore, could ordinarily be protected by the work-product privilege.

Even assuming that the document was prepared at the direction of counsel, the court concludes that whatever privilege the document may have had was waived by Mr. Fullbright and counsel present for his deposition, well before different counsel present for Mr. Brinkman's deposition attempted to assert that the document was privileged. An actual intention that the opposing party see the documents is *sufficient* but not *necessary* to effect a waiver of work-product privilege as to those documents. *See United States v. Johnson*, 378 F. Supp. 2d 1041, 1046-47 (N.D. Iowa 2005) (rejecting a reading of *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1997), for example, in *Gundracker v. Unisys Corp.*, 151 F.3d 842, 848 (8th Cir. 1998), as *requiring* an intention that the other party see the document). Inadvertent or unintentional disclosure of materials that might otherwise be protected by work-product privilege may also waive the privilege, but does not automatically do so. *See, e.g., In Re Grand Jury (Impound)*, 138 F.3d at 978, 981 (3d Cir. 1998) (so stating, and also recognizing that disclosure sufficient to waive the work-product protection does not have to be intentional). As the Third Circuit Court of Appeals has noted, "In determining whether a party has waived the privilege through an inadvertent or involuntary disclosure, courts consider, among other factors, the steps taken by a party to remedy the disclosure and any delay in doing so." *Id.* (citing cases). Here, the court does not believe that Norse Dairy can "seal the bag from which the cat has already escaped," *see Carter v. Gibbs*, 909 F.2d 1450, 1451 (Fed. Cir. 1990), by asserting privilege in Mr. Brinkman's deposition for a document that Mr. Fullbright had already asserted had been created at *his* direction, not counsel's direction, and about which Mr. Fullbright had already testified, without any objection or assertion of privilege by Norse Dairy's *lead counsel*, who was representing Mr. Fullbright at his deposition. Norse Dairy's attempt to claw back the privilege in Mr. Brinkman's deposition was, thus, too little too late.

Therefore, the court finds that this document is admissible over Norse Dairy's work-product privilege objection, because any privilege was waived.

### 2. *Evidence of future market shares*

Next, BoDeans asserts that Norse Dairy intends to introduce as part of its defense to BoDeans's claims evidence of and testimony about the parties' future market shares based on future sales that Norse Dairy attributes to BoDeans. BoDeans asserts that the documents on which Norse Dairy's witnesses will rely for such testimony are those attached to BoDeans's Motion In Limine as Exhibits 8 to 20.

### a. *Arguments of the parties*

BoDeans contends that this evidence, and related testimony, should be excluded as irrelevant, speculative, premised on hearsay, and lacking in foundation. BoDeans argues that evidence of future, projected, or potential market share is irrelevant, a distracting waste of time, and therefore excludable under Rules 402 and 403 of the Federal Rules of Evidence. BoDeans asserts that the proper questions for the jury are whether Norse Dairy possessed monopoly power, has prolonged its monopoly through exclusionary contracts, and has foreclosed BoDeans from the market in the past, not the future, so that future market share projections simply shed no light on those questions. Indeed, BoDeans characterizes Norse Dairy's argument as being no better than a criminal defendant prepared to take the stand to argue that he is innocent because he will be a better person in the future. BoDeans also argues that Norse Dairy cannot disprove possession of monopoly power or market foreclosure in the past based on unfounded assumptions about the future. Finally, BoDeans contends that Norse Dairy has no admissible basis to project that third-party customers will switch to BoDeans.

Norse Dairy argues that BoDeans's future market shares and sales go to the heart of BoDeans's antitrust claims, because the evidence in question shows that BoDeans

continues to increase dramatically its cone and wafer sales and continues to be tremendously successful. Specifically, Norse Dairy argues that, in August 2009, Nestlé/Dreyer informed both BoDeans and Norse Dairy of its decision to award BoDeans all of its sleeved cone business and a large portion of its novelty wafer business as of January 1, 2010, which demonstrates the truly competitive nature of the wafer and cone business. In other words, Norse Dairy argues that this evidence shows that BoDeans has, in fact, competed successfully with Norse Dairy, and that it would be artificial to exclude any evidence about the parties' business successes or failures after a cutoff date at the close of discovery. Thus, Norse Dairy argues that a focus on an antitrust defendant's current market share is misguided and that BoDeans seeks to exclude evidence of future market share, not because it is irrelevant or speculative, but because it directly undermines BoDeans's case. Norse Dairy also argues that BoDeans is seeking future damages, including its expert's calculation that the damages from Norse Dairy's alleged antitrust violations will continue for 9 to 18 months after Norse Dairy is compelled to end such violations, and BoDeans is also asserting a claim for permanent injunctive relief into the future. These damages claims, Norse Dairy argues, make future market share evidence relevant to the case.

In reply, BoDeans argues that, even if the court could conclude that future market shares are somehow theoretically relevant to this case, Norse Dairy cannot rely on inadmissible hearsay and unreliable speculation to predict future market shares. BoDeans argues that Norse Dairy has offered no documentary evidence of future business that has been definitively awarded to BoDeans or any other documents supporting Norse Dairy's predictions about future market shares. Instead, BoDeans asserts that Norse Dairy simply relies on hearsay statements about intent to take future actions that have never occurred, which are not admissible "mental state" statements pursuant to Rule 803(3). BoDeans also

argues that Norse Dairy cannot "launder" such hearsay through an expert in an attempt to show future market shares. BoDeans also disputes that its claim for post-trial damages opens the door to evidence about future market shares, when that claim is based on the continuing effects of *past* misconduct by Norse Dairy. Finally, BoDeans argues that Norse Dairy cannot offer testimony about changes that Norse Dairy has decided to make in its business in the future, because abandonment of past anticompetitive practices would be irrelevant to liability for past conduct.

### b.    *Analysis*

The court is not persuaded that evidence of projections of future market shares is relevant to any issue in this case. Such evidence would necessarily be based on projections (or merely speculations) about the parties' future conduct, the future conduct of third parties, and future market conditions. In contrast, as the court recently explained in a cover letter accompanying its first draft of proposed Jury Instructions in this case, all claims before the jury are based on *past* conduct. Thus, issues of future harm are not relevant to the jury trial, because injunctive relief will be for the court to decide, and BoDeans makes no prayer for "future lost profits," at least as the court reads the instructions so far proffered by BoDeans. In the court's view, evidence of projections of either party's future market shares do not make it any more or less likely that BoDeans suffered harm from *past* conduct, because such projections are based on numerous, essentially unpredictable circumstances. To the extent that BoDeans may intend to assert that the *harm* from *past* conduct may extend into the *future* (whether for 9 months, 18 months, or some other period), even if unlawful conduct stops at the date of the verdict, that assertion does not open the door to evidence of projections of future market shares, although it would require BoDeans to request Jury Instructions concerning "future lost profits," from the date of the verdict into the future, which BoDeans has not yet done.

14

Such an instruction would have to include an explanation that, for BoDeans to obtain such "future lost profits," the jury must be able to find by the greater weight of the evidence that *harm from past conduct* will extend into the future. Norse Dairy's projections about what BoDeans's market share might be like in the future, however, is not relevant to such a limited question of "future lost profits," because it does not make it any more or less likely that Norse Dairy actually engaged in misconduct in the past. Therefore, Norse Dairy's future market share evidence is not relevant or admissible pursuant to Rules 401 and 402 of the Federal Rules of Evidence. FED. R. EVID. 401 (evidence is relevant, if it has some tendency to prove or disprove an issue in the case); FED. R. EVID. 402 (irrelevant evidence is inadmissible).

Norse Dairy argues that *United States v. Syufy Enterprises*, 903 F.2d 659 (9th Cir. 1990), somehow shows that future market share is relevant and that a focus on current market share is misguided. While *Syufy* may stand for the latter proposition, it certainly does not stand for the former. The court in *Syufy* did observe that the United States Department of Justice had attributed "far too much importance" to the fact that Syufy still had a large market share of the first-run movie market in Las Vegas. *Syufy*, 903 F.2d at 665. However, the court did not find that the error was failing to look to *future* market share, but failing to consider whether Syufy had been able to *maintain* market share *over the last several years*. *Id.* at 665-66. Norse Dairy is correct that the court suggested that "the government would do better to plot these points [showing market share each year in the past] on a graph and observe the pattern they form than to focus narrowly on Syufy's market share at a particular time." *Id.* at 666. However, nowhere is there any discussion in *Syufy* of attempting to plot these points *into the future*, only observations about the parties' market share trends in the *past*. *Id.* Similarly, here, the parties recognized in their proposed Jury Instructions that "market share trends," that is, the increase or

15

decrease over time of the parties' market shares *in the past*, are relevant to questions about whether, for example, Norse Dairy has had, maintained, or attempted to acquire monopoly power, but the proffered instructions on "market share trends" did not include consideration of market shares beyond the present.

Even to the extent that projections about future market shares might shed some light on Norse Dairy's ability *in the past* to acquire or maintain monopoly power—a proposition the court finds dubious at best—the limited probative value of such evidence is substantially outweighed by the potential for confusing or misleading the jury or simply wasting time, as the case would necessarily be diverted into a minitrial about the validity of assumptions about the future market for the various products at issue, the future behavior of customers, the possibility of other competitors entering or leaving the market, and general business conditions in the future. Thus, this evidence is also inadmissible under Rule 403. FED. R. EVID. 403 (permitting exclusion of relevant evidence if its probative value is outweighed by its potential, *inter alia*, for prejudice, confusion of the issues, misleading the jury, or waste of time).

In contrast to other evidence of "future market shares," Norse Dairy is correct that evidence, if any, that BoDeans has actually been awarded a lucrative contract, such as the Nestlé/Dreyer contract, since the close of discovery, to take effect in the near future, is plainly relevant to the question of whether BoDeans has been foreclosed from competing *in the past*, even if BoDeans will not increase its market share based on that award of business until some point in the future. Such evidence is relevant to show that *past* misconduct by Norse Dairy has *not* foreclosed BoDeans from competing, at least to the extent that the award of the contract is an historical fact. Based on the historical fact of the award of a contract in the recent past, to take effect in the near future, it might also be possible to make non-speculative calculations, that is, calculations to a reasonable degree

of certainty, about the effect of that contract on the parties' relative market shares *in the near future*, at least, *if* there is reliable evidence of the market share that the contract represents. What would remain inadmissible (as irrelevant), however, is speculation about what contracts BoDeans *might* obtain in the future and what its market share *might* be in the future based on such speculations. To the extent that BoDeans claims that there is no basis for or that BoDeans does not know the basis for Norse Dairy's calculation of the value of the Nestlé/Dreyer contract, if that contract has in fact been awarded, or the effect that contract will have on the parties' market shares when it becomes effective, the remedy is not exclusion of the evidence, but allowing BoDeans the opportunity to depose Norse Dairy's pertinent witnesses about such calculations.

Thus, this part of BoDeans's Motion In Limine will be granted as to evidence of the parties' future market shares, but denied as to evidence of any contracts already awarded that will take effect at a later date and the effect of any such contracts on the parties' market shares at the time that they take effect. The admissibility of such evidence of contracts already awarded but to take effect in the future is subject to foundational and other objections, including challenges to the dollar amount of and/or the market shares for products involved in those contracts, and subject to Norse Dairy making available for deposition prior to trial pertinent witnesses so that BoDeans can explore the bases for their calculations of the value and/or market shares represented by such contracts.

### 3. *The list of manufacturers of novelty ice cream products*

The next item of evidence that BoDeans challenges is a spreadsheet purporting to list the offerings of various ice cream companies by category, purportedly prepared by the International Dairy Foods Association. *See* BoDeans's Motion In Limine (docket no. 52), Exhibit 22 (also marked NDS-IBF000030006999-7013). The challenge to this item of evidence is the only one that Norse Dairy does not oppose; indeed, Norse Dairy represents

that it will withdraw the exhibit in question. Therefore, this portion of BoDeans's Motion In Limine will be denied as moot.

### 4. *Evidence relating to the Iowa Attorney General*

Next, BoDeans seeks to exclude evidence, identified, *inter alia*, as Exhibits 25 through 27 attached to its Motion In Limine. These exhibits are correspondence from BoDeans to the Iowa Attorney General (IAG) concerning BoDeans's allegations of antitrust violations by Norse Dairy or internal correspondence of BoDeans employees that refers to contact with the IAG about Norse Dairy's conduct.

### a. *Arguments of the parties*

BoDeans argues that Norse Dairy should not be allowed to offer these exhibits in support of any argument that the IAG somehow approved of Norse Dairy's conduct, because the IAG did not sue Norse Dairy. BoDeans argues that, because prosecutorial discretion is affected by numerous considerations, the IAG's decision not to sue Norse Dairy does not provide any insight into the IAG's level of concern about Norse Dairy's alleged antitrust violations or any inference that the IAG approved of Norse Dairy's conduct, particularly where the IAG conducted no formal investigation of Norse Dairy's conduct. Thus, BoDeans argues that this evidence would mislead the jury.

Norse Dairy argues that BoDeans is taking inconsistent positions, seeking the admissibility of an e-mail discussing the DOJ's decision not to challenge Interbake's acquisition of Norse Dairy in 2000, before BoDeans even existed, but seeking to exclude evidence of the IAG's decision just last year not to investigate the very conduct at issue in this case. Norse Dairy argues that BoDeans's objections to evidence of the correspondence with the IAG goes to its weight, not its admissibility. Norse Dairy also represents that it has never argued and does not intend to argue that the IAG's decision not to investigate BoDeans's complaint constitutes approval of Norse Dairy's conduct. Rather, Norse Dairy

contends that this evidence is relevant, because it shows that the IAG declined even to contact Interbake or Norse Dairy, much less open an investigation, when presented with precisely the same allegations that BoDeans makes in this case. Norse Dairy argues that BoDeans is free to assert that there are various reasons why the IAG decided not to open an investigation, but that BoDeans has shown no basis to exclude this evidence.

### b. Analysis

The parties have not directed the court to any judicial decision considering the admissibility of evidence about or from antitrust enforcement actions, or the lack of any such actions, for example, by a state's attorney general or the United States Department of Justice, in a private party's civil action alleging antitrust violations, and the court has found none. Nevertheless, in other contexts, such as employment discrimination cases, the question of whether to admit or exclude evidence of administrative findings, investigations, action, or inaction, is within the sound discretion of the court. *See, e.g., Phan v. Trinity Regional Hosp.*, 3 F. Supp. 2d 1014, 1017 (N.D. Iowa 1998). More specifically, the court must "'ensure that unfair prejudice does not result from a conclusion based on a cursory [administrative] review of the very facts examined in depth at trial.'" *Id.* (quoting *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1105 (8th Cir. 1988)). The court believes that the same concern with unfair prejudice from admitting evidence about action or inaction of a state or federal enforcement agency, based on the agency's cursory investigation or review of facts examined in depth at a civil trial, is likely to arise in a case involving alleged antitrust violations. Before undertaking such a "prejudice" analysis, pursuant to Rule 403, however, the court believes that it should also consider the probative value of the evidence in question. *See* FED. R. EVID. 401 & 402.

Here, the court finds little if any probative value in the evidence identified by BoDeans concerning BoDeans's contact with the IAG about alleged antitrust violations by

Norse Dairy. The proffered evidence does *not* include any correspondence from the IAG's Office and no firsthand evidence of the reasons that the IAG might have decided not to investigate BoDeans's antitrust claims. Thus, this evidence presents only tenuous inferences as to why the IAG declined even to contact Interbake or Norse Dairy, much less open an investigation, when presented with precisely the same allegations that BoDeans makes in this case. Precisely because there is no indication from this evidence that the IAG undertook any kind of investigation, the decision not to open a formal investigation does little to make it more or less likely that BoDeans's allegations are true. *See* FED. R. EVID. 401 (evidence is relevant, if it has some tendency to prove or disprove an issue in the case).

Such slight probative value is plainly outweighed here by the potential for unfair prejudice that might arise from admitting evidence of the IAG's inaction, based on the IAG's cursory investigation, no investigation, or, at best, a limited review of the facts that the jury will be asked to review in depth in this civil trial. *Cf. Phan*, 3 F. Supp. 2d at 1017; FED. R. EVID. 403 (permitting exclusion of relevant evidence if its probative value is outweighed by its potential, *inter alia*, for prejudice, confusion of the issues, misleading the jury, or waste of time). Such evidence might suggest a decision by the jury on the improper basis that some state agency had already concluded that there was no antitrust violation, thus substituting the agency's determination, on the basis of whatever evidence the agency did or did not consider, for the jury's reasoned decision based the evidence presented at trial. *See, e.g., United States v. Myers*, 503 F.3d 676, 681 (8th Cir. 2007) (Rule 403 does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case, but does protect against evidence that is unfairly prejudicial, in that it tends to suggest decision on an improper basis). Indeed, Norse

Dairy's argument for admission of this evidence suggests that Norse Dairy hopes that the jury will do just that.

This portion of BoDeans's Motion In Limine will be granted, and evidence relating to the Iowa Attorney General's consideration of BoDeans's antitrust claims against Norse Dairy, including Exhibits 25 through 27 attached to its Motion In Limine, will be excluded.

### 5.    *Evidence about Dean Jacobson's vacation home*

BoDeans's last evidentiary challenge is to evidence that Dean Jacobson, BoDeans's principal, received disbursements from BoDeans enabling him to buy a $2.5 million vacation residence in Park City, Utah.

#### a.    *Arguments of the parties*

BoDeans does not dispute that it has been a profitable enterprise, but asserts that evidence of how an entrepreneur spends his money is absolutely irrelevant to any issue in the case, because it has no bearing on whether Norse Dairy's conduct violated antitrust laws. BoDeans asserts that Norse Dairy intends to offer this evidence only for the prejudicial reason of trying to create some kind of cloud over disbursements of BoDeans's partnership proceeds to Mr. Jacobson and to deflect the jury's attention from relevant issues to how Mr. Jacobson spends his money.

Norse Dairy hastens to assert that it does not intend to argue or insinuate that Dean Jacobson improperly obtained any funds from BoDeans. Norse Dairy does assert, however, that it is relevant that, in 2008, Mr. Jacobson concluded that BoDeans was in such good financial health and its prospects were so good that BoDeans could make a profit distribution to Mr. Jacobson for the purpose of buying a $2.5 million vacation home. Norse Dairy points out that BoDeans is a privately-held company, so that the decision to distribute profits is particularly relevant to show the financial success of BoDeans. Norse

Dairy argues that the inference of business success from this distribution is in sharp contrast to BoDeans's contentions that it has been prevented from competing effectively by Norse Dairy's conduct. Norse Dairy argues that Mr. Jacobson's purchase of a vacation home with funds from a partnership distribution is a concrete example of BoDeans's competitive and financial success.

### b. Analysis

The admissibility of this evidence need not detain the court long. While there may be some limited probative value in an antitrust case to evidence of a sizeable partnership distribution to the principal of a company claiming that it has been prevented from competing effectively in the marketplace, there is little or no probative value to evidence of what the partner did with the money. Moreover, whatever probative value evidence that Mr. Jacobson bought a vacation home with his partnership distribution may have is substantially outweighed by the potential prejudice arising from the possibility that jurors will decide this case on the improper basis that they do not like what Mr. Jacobson does with his money or do not like apparently "rich" people, with vacation homes, complaining about losing money. FED. R. EVID. 403, Advisory Committee Notes (explaining that "prejudice" includes a decision on an "improper basis," and an "improper basis" for a decision is "commonly, though not necessarily, an emotional one"); *see also United States v. Jiminez*, 487 F.3d 1140, 1145 (8th Cir. 2007) (quoting this note).

This part of BoDeans's Motion In Limine will be granted.

### B. Norse Dairy's Motion In Limine

The other evidentiary motion now before the court is Norse Dairy's September 15, 2009, Motion In Limine To Exclude Testimony And Evidence Relating To Surveys Conducted By Walker Information, Inc. (docket no. 55). Norse Dairy explains that the

evidence at issue in this motion consists of customer survey responses obtained and reports or presentations about the survey results by Walker Information, Inc., a third-party consulting firm that provides strategic planning information for its clients based on customer feedback. Norse Dairy retained Walker Information at various times to conduct surveys of Norse Dairy's customers and to report the results. According to Norse Dairy, the survey responses reported were recorded by Walker Information's survey takers and include Walker Information's subjective characterization of those responses. Norse Dairy contends that BoDeans seeks to introduce this evidence as evidence of what Norse Dairy's customers said and believe about their relationship with Norse Dairy to prove the facts stated or believed.

### 1. *Arguments of the parties*

Norse Dairy contends that this evidence should be excluded, because it consists of multiple types and levels of hearsay, including descriptions of out-of-court statements of customers offered for their truth, direct quotes of customers, summaries and categorizations of survey responses, and double-hearsay summaries and reports not compiled by the interviewers themselves. Norse Dairy contends that no hearsay exception is applicable to any of this evidence. Somewhat more specifically, Norse Dairy argues that the survey results are not business records within the meaning of Rule 803(6), because of they lack trustworthiness; they are not admissions of a party-opponent within the meaning of Rule 801(d), because the statements were not made by Norse Dairy or its agents, nor are they adoptive admissions within the meaning of Rule 801(d), because Norse Dairy never adopted them; and they are not admissible as statements of the declarant's then-existing state of mind within the meaning of Rule 803(3), where customers' subjective opinions are not at issue in this antitrust case. Norse Dairy also argues that there is no Rule 807 "residual" hearsay exception for this evidence, because the evidence is inherently

unreliable, where Walker Information unfairly characterized responses to fit into boilerplate categories used for all clients' surveys and "cherry-picked" responses—particularly negative responses—for "shock value" to make particular points about customer views. Thus, Norse Dairy argues that the survey results are not reliable evidence of what customers said or believed.

Norse Dairy also argues that any characterization of the survey results as showing that Norse Dairy's customers purportedly "feel trapped" should be excluded pursuant to Rule 403, because such evidence would be unfairly prejudicial to Norse Dairy and likely to confuse the jury. Norse Dairy explains that no customer actually said it felt trapped, but Walker Information characterized customer responses in that way, and jurors could be misled into believing that Walker Information's characterizations of customers' comments are evidence of Norse Dairy's alleged market power. Norse Dairy argues that proper evidence of customer statements and attitudes would only take the form of testimony by actual customers.

BoDeans counters that Norse Dairy relied on the surveys for purposes of strategic planning and had not previously questioned their accuracy or reliability, but now asserts that the surveys are unreliable and untrustworthy when the surveys are offered against Norse Dairy. BoDeans argues that the surveys were conducted by a sophisticated market-research firm, they were completed directly by customers, they were properly tabulated, and Walker Information vouches for the reliability of the results. Contrary to Norse Dairy's contentions, BoDeans argues that the surveys, the summaries of the surveys, and the presentations and testimony about the surveys should be admitted pursuant to Rules 807, 803(3), 803(6), and 801.

Somewhat more specifically, BoDeans asserts that the survey evidence is admissible pursuant to the "residual" hearsay exception in Rule 807, because of the steps that Walker

Information goes through to ensure accurate customer feedback and accurate survey results, and because Norse Dairy has never explained how the survey methodology is flawed and has itself adopted and used the results for business planning. BoDeans also argues that, even if Walker Information "cherry-picked" certain responses for reports, doing so does not undermine the trustworthiness of the evidence, where Norse Dairy has acknowledged that the purpose of doing so was to emphasize certain points. BoDeans also asserts that the other requirements of Rule 807 are satisfied here, because customer dissatisfaction is material to the unlawful practices at issue; the evidence is more probative and efficient than alternatives, such as widespread discovery concerning individual customers; and justice will be served by admitting the survey evidence, because such evidence will allow the jurors to consider the same information that Norse Dairy relied on in the ordinary course of its business. BoDeans argues that the surveys are also admissible pursuant to Rule 803(3), because they asked customers precisely about their then-existing state of mind, and pursuant to Rule 803(6) as business records, because they were prepared in the ordinary course of Walker Information's business according to established protocols and, contrary to Norse Dairy's contentions, they are trustworthy. BoDeans also argues that the surveys are admissible pursuant to Rule 801(d)(2) as adopted admissions, where Norse Dairy adopted them as part of its business planning. BoDeans also argues that the admissibility of the evidence in question should not be parsed between surveys, on the one hand, and summaries of and presentations about the results, on the other, where the summaries and presentations merely compile and present the results.

Finally, BoDeans argues that the evidence is not inadmissible pursuant to Rule 403. BoDeans reiterates that the evidence is highly probative of Norse Dairy's market power, injury to competition, lack of legitimate business justification for its conduct, and BoDeans's damages. BoDeans argues that evidence that a large percentage of Norse

Dairy's customers would like to switch suppliers, but cannot, goes to the heart of this antitrust case. Thus, BoDeans argues that the evidence in question is both probative and not unfairly prejudicial.

In reply, Norse Dairy reiterates its contention that the survey reports and presentations are not objective, but flawed, intentionally biased, and inaccurate. Norse Dairy argues that BoDeans's focus on the underlying survey methodology is a red herring, because BoDeans is not interested in merely presenting the raw survey results to the jury. Norse Dairy adds that almost all of the cases in which survey results have been admitted have been trademark or false advertising cases, in which the customers' state of mind is a fundamental issue, not antitrust cases, in which customer confusion is not an issue. Norse Dairy counters BoDeans's argument that the survey evidence is admissible pursuant to Rule 803(3) by asserting that the "state of mind" exception does not extend to a statement of memory or belief to prove the fact remembered or believed. Thus, Norse Dairy contends that this exception does not apply to BoDeans's intent to use the survey evidence to prove that customers *were* trapped, not merely that they *felt* trapped. Norse Dairy also denies that it has adopted the results of the surveys, so that they are not admissible as adopted admissions pursuant to Rule 801(d)(2), because requesting a survey does not amount to adoption of the results of the survey, and Norse Dairy executives disagreed with the survey results rather than adopting them. Norse Dairy contends that BoDeans's business records argument would eliminate, at most, one level of the "double hearsay" problem with the survey evidence, but does not eliminate the second level of hearsay, which is that the presentations and reports are replete with summaries and excerpts of the survey respondents' out-of-court statements.

## 2. *Analysis*

Both parties recognize that one of the most comprehensive discussions of the admissibility of survey evidence is to be found in then-Circuit Judge, now-Justice, Sotomayor's decision in *Schering Corporation v. Pfizer, Inc.*, 189 F.3d 218 (2d Cir. 1999). Although *Schering* is a Lanham Act false advertising case, not an antitrust case, this court nevertheless finds it instructive.

### a. *Admissibility of surveys in general*

In *Schering*, the court first recognized that there is a general trend toward admission of surveys of various kinds, but that surveys are routinely admitted in trademark and false advertising cases, which depend upon such things as customer confusion, far more frequently than in other kinds of cases. *Schering*, 189 F.3d at 225. Indeed, the court concluded that "the case law does not support a general rule allowing surveys into evidence for all purposes." *Id.*

The court in *Schering* found that a review of the cases demonstrated that "there are, in fact, two ongoing controversies that tend to complicate the question of whether survey evidence should be admitted in a particular case": (1) "a dispute over the proper consequence of a finding of methodological error in a survey," and (2) a dispute "involv[ing] the proper rationale for allowing admissible surveys into evidence." *Id.* at 225-26. The court rejected the contention of skeptics that the admissibility of survey evidence depends upon whether the judge favored or rejected the survey results, finding, instead, that the admissibility of such evidence was dependent upon interpretation of the Federal Rules of Evidence. *Id.* at 227. The court in *Schering* then considered the common bases for admission of survey evidence as they applied to the survey evidence in question in that case. This court will do the same, although this court will include grounds not addressed in *Schering*, but asserted by the parties here.

### b.    Admissibility under Rule 803(3) as state of mind evidence

The court noted that "[o]ne of the most common bases for admitting survey evidence is Rule 803(3), which creates an exception to the hearsay rule for statements that express a declarant's state of mind at the time of the utterance." *Id.*  The parties in this case also raise the question of the admissibility of the survey evidence pursuant to this hearsay exemption.

According to the court in *Schering*, surveys that "poll individuals about their presently-existing states of mind to establish facts about the group's mental impressions" are generally admissible pursuant to this rule.  The court noted, "It is important for district courts to recognize surveys of this type because their qualification for a traditional hearsay exception obviates the need to examine methodology before overruling a hearsay objection," while errors in methodology would go to the weight of such survey evidence and to the Rule 403 balance of probative value against potential for prejudice.  *Id.* at 227-28.  The court then considered whether the survey respondents' state of mind was relevant to the litigation before the court.  *Id.* at 229 (concluding that mental impressions with which an audience is left can be relevant, and are sometimes even necessary, to establish what a defendant is implying in a challenged representation in a Lanham Act case).  Although the court found that the survey results were admissible in the case before it, the court cautioned that the district court was not required to give the surveys any particular weight.  *Id.* at 230.  On the other hand, the court observed that surveys would not be admissible pursuant to Rule 803(3), if they were offered as statements of memory or belief to prove the facts remembered or believed, *i.e.*, to show what actually happened, because Rule 803(3) explicitly excluded such use from its purview.  *Id.* at 231-32.

Here, the court finds that the Walker Information surveys and reports do fall within the purview of Rule 803(3), because the surveys polled Norse Dairy customers about their

then-existing states of mind, and the surveys are offered to establish facts about the group's mental impressions about their relationship with Norse Dairy. *Id.* at 227 (considering whether the evidence fits Rule 803(3)'s mental state exception). That evidence is also relevant here, as BoDeans contends, to show Norse Dairy's market power, injury to competition, lack of legitimate business justification for its conduct, and BoDeans's damages, because it shows that a large percentage of Norse Dairy's customers would like to switch suppliers, but believe that they cannot, and thereby shows that other competitors are foreclosed from competing, because available customers believe that they are locked in to Norse Dairy. *Id.* at 229 (considering whether the mental-state evidence is relevant to the claims at issue). The survey evidence of what the customers believed, however, cannot be admitted under Rule 803(3) to prove the facts believed, *i.e.*, that the customers actually were prevented from using other suppliers. *Id.* at 229 (Rule 803(3) does not permit use of evidence of statements of memory or belief to prove the facts remembered or believed, *i.e.*, to show what actually happened). Norse Dairy's complaints about methodology of the surveys would go to the weight of such survey evidence, not the admissibility of the survey evidence under Rule 803(3), and to the Rule 403 balance of probative value against potential for prejudice, which the court will address separately below. *Id.* at 227-28. Thus, the surveys and reports are admissible, at least for some intended uses, pursuant to Rule 803(3).

### c.     *Admissibility under the "residual" exception in Rule 807*

The court in *Schering* also noted that the "residual" hearsay exception in Rule 807 was a second common basis for admitting survey evidence. The court found that the Rule 803(3) limitation on memory statements offered to establish the facts remembered could not be projected into the Rule 807 context, because Rule 807 has its own requirements for admissibility. *Id.* (citing FED. R. EVID. 807). Thus, while the survey evidence here may

not be admissible pursuant to Rule 803(3) to the extent that it is offered to prove that customers were actually prevented from using other suppliers, the survey evidence may be admissible for that purpose pursuant Rule 807, if it otherwise meets the requirements of that rule.

Rule 807 provides as follows:

> A statement not specifically covered by Rule 803 or 804 but *having equivalent circumstantial guarantees of trustworthiness*, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception *unless* the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

FED. R. EVID. 807 (emphasis added). Thus, as the court explained in *Schering*, evidence is admissible under Rule 807 if it meets the requirements of "'trustworthiness, materiality, probative importance, the interests of justice, and notice.'" *Schering*, 189 F.3d at 231-32 (quoting *United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993), in turn quoting *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991)).

*i.* **Trustworthiness**. Norse Dairy's primary argument that the Rule 807 "residual" hearsay exception does not apply here is that the survey evidence is untrustworthy. The court in *Schering* found that a Rule 807 trustworthiness analysis must consider the four classes of risk peculiar to hearsay evidence, (1) insincerity, (2) faulty

perception, (3) faulty memory, and (4) faulty narration, each of which decreases the reliability of the inference from the statement made to the conclusion for which it is offered. *Schering*, 189 F.3d at 232. To this list, the court found that survey evidence added "an additional class of risk arising from the fact that parties usually offer surveys to support statistical inferences," because "[t]hese inferences can be subject to methodological error and can sometimes be manipulated through artful data collection or presentation." *Id.* at 233. The court noted that proper survey methodology can reduce the first and fourth risks, but does not generally tend to mitigate faulty memory or perception, although a properly conducted survey could theoretically minimize the four classic risks of hearsay and the fifth risk peculiar to survey evidence. *Id.* at 234.

It appears to this court that Norse Dairy's contentions that the Walker Information surveys are untrustworthy relate to the fourth classic risk of hearsay, faulty narration, and the fifth risk peculiar to survey evidence, artful presentation of data, because Norse Dairy argues that Walker Information unfairly characterized responses to fit into boilerplate categories used for all clients' surveys and "cherry-picked" responses—particularly negative responses—for "shock value" to make particular points about customer views. Yet, as BoDeans points out, Norse Dairy, not BoDeans, commissioned these surveys and then used them in its business planning. It is difficult for the court to take seriously "trustworthiness" challenges to a survey made by the very party that commissioned and used the survey in the first instance, albeit not for purposes of the present litigation. *See id.* at 236 (noting that the party challenging the survey evidence actually requested one of the surveys). Indeed, the fact that the interviewers did not know that the surveys could be used for purposes of antitrust litigation supports the inference that the surveys are trustworthy. *See id.* at 225 (noting that, among the factors going to the admissibility and weight to be given surveys under the "modern view" is whether the survey used

interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted). BoDeans also points out that the surveys were conducted by a sophisticated market-research firm using appropriate methodology and that Walker Information's representatives adequately explained the bases for their selection of material to include in presentations, that is, to make particular points about customer views. Under these circumstances, the court finds that the survey information is sufficiently trustworthy to be admissible pursuant to Rule 807.

*ii.* ***Other requirements***. There are other requirements for admissibility pursuant to Rule 807, however. The court recognized above, in its discussion of admissibility of this evidence pursuant to Rule 803(3), that the evidence is relevant or "material" to the questions of Norse Dairy's market power, injury to competition, lack of legitimate business justification for its conduct, and BoDeans's damages, because it shows that a large percentage of Norse Dairy's customers would like to switch suppliers, but believe that they cannot, and thereby shows that other competitors are foreclosed from competing, because available customers believe that they are locked in to Norse Dairy. Thus, the "materiality" requirement of Rule 807 is met here. *See id.* at 231.

As to whether this evidence is more probative than other evidence on the point for which it is offered, the court explained in *Schering*, "Rule 807(B)'s so-called 'necessity' criterion . . . requires courts to compare the reliability, or trustworthiness, of a survey with that of other evidence that a proponent might reasonably obtain to establish the same fact." *Id.* at 236. While there is certainly other evidence that would be probative of whether Norse Dairy has market power and has injured competition, it seems likely that the proffered survey evidence uniquely proves that customers did not see a business justification for Norse Dairy's conduct and that customers believed that they were actually unable to switch suppliers, because of Norse Dairy's conduct. While Norse Dairy suggests

that BoDeans could (and should) present, instead, testimony from individual customers, if BoDeans did so, Norse Dairy would doubtless argue that such evidence was merely anecdotal, but not sufficient to prove that Norse Dairy actually had the market power to prevent customers from using other suppliers. The court finds that customer surveys are more probative of the beliefs and experiences of *all* of Norse Dairy's customers than anecdotal testimony by some or a few customers, and that it is impracticable to call sufficient individual customers to establish the necessary inferences. *Cf id.* at 236.

In *Schering*, the court suggested, "In the context of survey evidence, the interests of justice and the general purposes of the rules of evidence are generally best served by the admission of surveys that meet [the necessity and trustworthiness] criteria." *Id.* at 238. Where, as here, these two criteria have been met, the court finds that the "interests of justice" requirement of Rule 807 is also met.

Finally, Norse Dairy plainly cannot complain that it has received inadequate notice sufficiently in advance of the trial to provide it with a fair opportunity to prepare to meet the evidence and BoDeans's intention to offer the survey evidence and the particulars of it, so that the court finds that the "notice" requirement of Rule 807 is also satisfied. FED. R. EVID. 807; *Schering*, 189 F.3d at 231-32. Indeed, Norse Dairy's Motion In Limine and the briefing of that motion by both parties more than adequately meets the "notice" requirement of Rule 807.

Thus, the court finds that the survey evidence challenged here is admissible pursuant to Rule 807.

### d. *Admissibility as Rule 801(d)(2) adoptive admissions*

Rule 801(d)(2), in pertinent part, excludes from the hearsay rule "a statement offered against a party [that] is . . . (B) a statement of which the party has manifested an adoption or belief in its truth." FED. R. EVID. 801(d)(2)(B). In the criminal context, at

least, the Eighth Circuit Court of Appeals has found that a statement is admissible as an adoptive admission under Rule 801(d)(2)(B), if the party against whom it was offered was present when the statement was made, understood it, and had the opportunity to deny it. *See, e.g., United States v. Kehoe*, 310 F.3d 579, 591 (8th Cir. 2002). These requirements do not translate well to the context of survey evidence, however. The Fifth Circuit Court of Appeals found that "damage survey reports" were admissible where the party against whom they were offered met with the representative preparing the survey reports several times while he was preparing the reports and never objected to them. *United States v. Central Gulf Lines, Inc.*, 974 F.2d 621, 628 (5th Cir. 1992). However, the "survey" evidence in *Central Gulf Lines* appears to be so distinguishable from the survey evidence at issue here as to make that case less than instructive. Nevertheless, it seems likely that a "manifestation" of adoption or belief in the truth of survey evidence, as required by Rule 801(d)(2)(B), could be found from knowledge of the contents of the survey, failure to object to it, and *use* of the survey results in a manner suggesting that the user believed the results to be reliable.

That said, the court has considerable doubt that simply commissioning a customer survey or making some use of the survey results is sufficient to make the responses therein adoptive admissions of the commissioning party; indeed, here, Norse Dairy argues that it did not adopt the survey results, because its executives disagreed with them. The court finds that it need not decide the admissibility or inadmissibility of the survey results at issue here pursuant to Rule 801(d)(2)(B), however, because the court has found that the evidence is admissible on other grounds.

### e. Admissibility as business records pursuant to Rule 803(6)

BoDeans also contends that the surveys and, more importantly, the presentations, are admissible as "business records" under Rule 803(6). Rule 803(6) excludes from the hearsay rule records "if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." FED. R. EVID. 803(6). The court agrees with BoDeans that the surveys and presentations at issue here meet the "regular course of conduct" and "regular practice" requirements of Rule 803(6), because the surveys were prepared in the course of Walker Information's regularly conducted business activity and it was Walker Information's regular practice to make a memorandum, report, record, or data compilation of its survey results for presentation to the businesses that commissioned its services. FED. R. EVID. 803(6).

Norse Dairy premises its assertion that the survey evidence at issue here is inadmissible pursuant to the "business records" exception entirely on Norse Dairy's contention that the surveys are untrustworthy. BoDeans argues that Norse Dairy has fallen well short of showing any inaccuracies or other flaws in the surveys and presentations that would make them untrustworthy and, thus, inadmissible, and the court also agrees with BoDeans on this point. Indeed, the court has elsewhere rejected Norse Dairy's "trustworthiness" challenges to the survey evidence.

More specifically, the Eighth Circuit Court of Appeals recently affirmed exclusion of survey evidence on the ground that the information for the survey responses in question was "hastily gathered" and numerous responses were shown to be inaccurate. *See United States v. Missouri*, 535 F.3d 844, 852-53 (8th Cir. 2008). Here, in contrast, the court has no indication that the survey responses were collected in anything other than a sound

manner by a sophisticated market research company, and Norse Dairy has not shown specific, let alone widespread, inaccuracies in the recorded responses. While Norse Dairy asserts that its executives "disagreed" with the survey results, that is not the same as demonstrating that the responses were inaccurate. Similarly, while Norse Dairy takes issue with the characterizations of the responses in the presentations, the reasons for Walker Information's categorization and characterization of responses for purposes of its presentations seems to the court to go to the weight rather than the "trustworthiness" of the surveys and presentations.

Therefore, the court finds that the survey evidence, including Walker Information's presentations prepared from the survey responses collected, is admissible over hearsay objections pursuant to Rule 803(6) as "business records" evidence.

### f. Admissibility over "double hearsay" objections

Norse Dairy's penultimate challenge to the survey evidence is that it contains "double hearsay" summaries and reports not compiled by the interviewers themselves. "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." FED. R. EVID. 805. Thus, the fact that a statement comes through multiple declarants does not matter, so long as the test for admissibility of double hearsay in Rule 805 is met. *EEOC v. HBE Corp.*, 135 F.3d 543, 552 (8th Cir. 1998). Put another way, "double hearsay" "is inadmissible unless each level of hearsay falls within an exception to the hearsay rule." *United States v. Ortiz*, 125 F.3d 630, 632 (8th Cir. 1997) (citing FED. R. EVID. 805 and *Hoselton v. Metz Baking Co.*, 48 F.3d 1056, 1061 (8th Cir. 1995)). Contrary to Norse Dairy's contentions, however, the analysis above demonstrates that each level or layer of hearsay involved in the survey evidence, including the reports and presentations, falls within an exception to the hearsay rule. FED. R. EVID. 805;*HBE*

*Corp.*, 135 F.3d at 552; *Ortiz*, 125 F.3d at 632. Therefore, the survey evidence is not inadmissible "double hearsay."

### g. *Admissibility over Rule 403 objections*

Norse Dairy's last objection to the survey evidence, or at least to Walker Information's (or BoDeans's) characterization of that evidence as demonstrating that Norse Dairy's customers "felt trapped," is that, even if the survey evidence is otherwise admissible, it should be excluded pursuant to Rule 403, because its probative value, if any, is outweighed by its potential for unfair prejudice. Norse Dairy argues no customer actually said it "felt trapped," although Walker Information characterized customer responses in that way, and jurors could be misled into believing that Walker Information's characterizations of customers' comments are evidence of Norse Dairy's alleged market power.

Undoubtedly, Rule 403 permits the court to exclude relevant evidence if its probative value is outweighed by its potential, *inter alia*, for prejudice, confusion of the issues, misleading the jury, or waste of time. FED. R. EVID. 403. Here, however, the court has previously concluded that the survey evidence is relevant or "material" to the questions of Norse Dairy's market power, injury to competition, lack of legitimate business justification for its conduct, and BoDeans's damages, because it shows that a large percentage of Norse Dairy's customers would like to switch suppliers, but believe that they cannot, and thereby shows that other competitors are foreclosed from competing, because available customers believe that they are locked in to Norse Dairy. The court does not agree with Norse Dairy that any particular characterization of the results as showing that customers "felt trapped" or felt "locked in" is unduly prejudicial, even if no customer used those precise words. In the court's view, such characterizations are in the nature of "lay

opinions," which are admissible if the requirements of Rule 701 of the Federal Rules of Evidence are met. Rule 701 provides,

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

FED. R. EVID. 701. Here, characterization of the customers' responses as showing that they "felt trapped" may be rationally based on the perception of the witness describing the customers' responses, would be helpful to a clear understanding of a determination of whether the customers' responses indicated Norse Dairy had market power, injured competition, or lacked legitimate business justification, and, while based on survey results, nevertheless would not be based on scientific, technical, or other specialized knowledge within the scope of Rule 702. *Id.* Norse Dairy would be free, of course, to impeach such a characterization of the survey results, *inter alia*, by showing that no customer actually used such an expression.

Thus, Norse Dairy's Rule 403 challenge to the survey evidence will also be overruled.


### III. CONCLUSION

Upon the foregoing,

1.     The portions of BoDeans's September 15, 2009, Motion In Limine (docket no. 52) not resolved by the court's September 16, 2009, Order (docket no. 56), are **granted in part and denied in part**, as follows:

38

a.      That part of BoDeans's Motion seeking a ruling that the May 25, 2000, e-mail from Ray Baxter, BoDeans's Motion In Limine (docket no. 52), Exhibit 2 (also marked BoD002249 and Baxter Deposition Exhibit 4), is admissible over privilege objections is **granted**, because the e-mail in question is not protected by work-product privilege and is admissible;

b.      That part of BoDeans's Motion seeking a ruling that an April 21, 2008, e-mail circulated among Norse Dairy executives to which was attached a spreadsheet entitled "BoDeans Decision Tree," BoDeans's Motion In Limine (docket no. 52), Exhibits 6 & 7, is admissible over privilege objections is **granted**, because any privilege was waived;

c.      That part of BoDeans's Motion seeking an order excluding evidence of the parties' future market shares is **granted** as to evidence of the parties' future market shares, but **denied** as to evidence of any contracts already awarded that will take effect at a later date and the effect of any such contracts on the parties' market shares at the time that they take effect;

d.      That part of BoDeans's Motion seeking an order excluding a spreadsheet purporting to list the offerings of various ice cream companies by category, purportedly prepared by the International Dairy Foods Association, BoDean's Motion In Limine (docket no. 52), Exhibit 22 (also marked NDS-IBF000030006999-7013), is **denied as moot**, where Norse Dairy represents that it will not offer the document in question and withdraws it as an exhibit;

e.      That part of BoDeans's Motion seeking an order excluding evidence identified, *inter alia*, as Exhibits 25 through 27 attached to its Motion In Limine, concerning contact between BoDeans and the Iowa Attorney General (IAG)

concerning BoDeans's allegations of antitrust violations by Norse Dairy, is **granted**;

      f.     That part of BoDeans's Motion seeking an order excluding evidence that Dean Jacobson received disbursements from BoDeans enabling him to buy a $2.5 million vacation residence in Park City, Utah, is **granted**.

2.     Norse Dairy's September 15, 2009, Motion In Limine To Exclude Testimony And Evidence Relating To Surveys Conducted By Walker Information, Inc. (docket no. 55) is **denied in its entirety**.

3.     To avoid exposure of potential jurors to information about excluded evidence, this ruling shall be sealed until ten (10) days after completion of trial, unless a party files a motion within that ten-day period showing good cause why the ruling should remain sealed.

**IT IS SO ORDERED.**

**DATED** this 6th day of October, 2009.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA